**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CECI AYALA-BLAND, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>     v.<br><br>WALMART, INC.,<br><br>               Defendant. | Case No.<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Ceci Ayala-Bland ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Walmart, Inc. ("Defendant" or "Walmart"), based upon personal knowledge with respect to herself, and on information and belief and the investigation of counsel as to all other matters. In support thereof Plaintiff alleges as follows:

## INTRODUCTION

1.      This is a class action on behalf of Plaintiff and thousands of other similarly situated customers of Walmart who used Walmart's money transfer services (the "Services"), who have been the victim of fraud at Walmart, have incurred losses due to that fraud, and have not been reimbursed by Walmart, and were entitled to such reimbursement by federal regulations and the marketing representations of Walmart.

2.      Walmart is a corporation with store locations that offer money transfer services at its stores.

3.      Money transfers are a common vehicle for fraud. For many years, Walmart customers have reported tens of millions of dollars annually in fraud-induced money transfers processed by Walmart employees.

1

4. These practices have harmed many consumers, including people struggling with debt, those threatened by imposters, and older Americans. Walmart is well aware that telemarketing and other mass marketing frauds, such as "grandparent" scams, lottery scams, and government agent impersonator scams, induce people to use Walmart's money transfer services to send money to domestic and international fraud rings. Nevertheless, Walmart has continued processing fraud-induced money transfers at its stores—funding telemarketing and other scams— without adopting policies and practices that effectively detect and prevent these transfers.

5. In some cases, Walmart's practices have even made it easier for fraudsters to collect fraud-induced money transfers at a Walmart store. For example, for years, it was Walmart's policy or practice not to deny payouts to suspected fraudsters at its stores, but instead to have its employees complete those transactions. Even after it became illegal in June 2016 for cash-to-cash money transfers to be used to pay for telemarketing transactions, Walmart failed to take appropriate steps to prevent those types of transfers at its locations.

6. As a result of Walmart's failure to take appropriate steps to mitigate the problem, consumers have lost substantial sums to frauds through money transfers effected at Walmart.

**PARTIES**

7. Plaintiff Ceci Ayala-Bland is, and at all times relevant to this action has been, a resident of Skokie, Illinois and a citizen of Illinois. Due to fraud, Plaintiff lost $4,500 in or about October 2021 at Walmart. Plaintiff filed a police report following this loss but was not reimbursed by Walmart.

8. Defendant Walmart, Inc. is a Delaware corporation with its principal place of business at 702 S.W. 8th Street, Bentonville, Arkansas 72716. Walmart transacts or has transacted business in this District, as well as throughout the United States.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of each of the Classes is a citizen of a State different from the Defendant.  The number of members of the proposed Classes in aggregate exceeds 100.  28 U.S.C. § 1332(d)(5)(B).

10.      This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within this District and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and because Defendant transacts business and/or has agents within this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A.  Overview

12.      Walmart offers a variety of financial services to its customers at its Customer Service Desks, which are located in all of its stores, and in its MoneyCenters, which are dedicated spaces for financial services located in less than half of Walmart's stores. Walmart's advertisements boast that it is "trusted by millions of customers as their one-stop shop for financial services."  Walmart's financial services include, but are not limited to, money transfers, credit cards, reloadable debit cards, gift cards, check cashing, bill payment, and money orders.  These financial services play a role in driving customer traffic to Walmart's stores, thereby generating significant retail sales for Walmart.

13.      Consumers can use Walmart's money transfer services to send and receive

money from its locations.   Walmart relies on other companies' money transfer systems to provide these services.   These companies, also referred to as providers, principals, licensed partners, or vendors (hereinafter "providers"), include MoneyGram International, Inc. ("MoneyGram"), RIA Financial Services, a subsidiary of Euronet Worldwide, Inc. (together, "Ria"), and The Western Union Company ("Western Union").   Walmart acts as an agent of these providers, and Walmart itself has been licensed as a money services business ("MSB") in the United States since December 2001.   Walmart offers money transfer services to consumers at thousands of locations in the United States and Puerto Rico, as well as in many other countries around the world, including, but not limited to, Mexico, Canada, the United Kingdom, Argentina, Guatemala, and Costa Rica.

14. Since at least 2005, Walmart has offered domestic and international money transfer services through MoneyGram at Walmart locations within the United States, Puerto Rico, and Mexico.   In 2018, Walmart began offering its own lower-cost money transfer service, called "Walmart2World Money Transfers Powered by MoneyGram," which allows consumers to send up to $2,500 from a Walmart location to be picked up at one of MoneyGram's agents that are located in 200 countries.

15. In April 2014, in addition to providing traditional money transfer services through MoneyGram, Walmart began offering its own white-label money transfer service, referred to as "Walmart2Walmart Money Transfers Powered by Ria," at many of its locations.   This service originally allowed consumers to send money transfers from one Walmart location to be picked up at another Walmart location in the United States and Puerto Rico.   In October 2016, Walmart expanded Walmart2Walmart services to offer money transfers to and from its stores in Mexico. In June 2017, Walmart also began offering Walmart2Walmart services in the United Kingdom

through its subsidiary Asda Stores Ltd.  In November 2019, Walmart announced that it was adding Ria as an additional money transfer provider for its Walmart2World international money transfers.

16.     Walmart uses its own point-of-sale system to process money transfers that are sent and received from its locations through any money transfer company.  Walmart also uses this system to exchange information with its providers.  Walmart designed and controls both the system in which its employees record information about money transfer senders and receivers, and whether and how its point-of-sale system can be used to stop fraud-induced transfers.

17.     Since 2007, Walmart has offered domestic and international money transfer services to consumers in Canada through Western Union.  Walmart also offers Western Union's money transfer services at its locations in other countries, such as Mexico, Great Britain (through Asda), Argentina, Guatemala, Costa Rica, Honduras, El Salvador, Nicaragua, Belgium, the Philippines, Nigeria, and Qatar.  In the spring of 2021, Walmart began offering money transfer services through Western Union at Walmart locations in the United States.

18.     For over a decade, fraudsters around the world have used money transfers to obtain money from their victims, especially U.S. consumers, and Walmart has long been aware that its locations have been used to perpetrate these frauds.  Walmart has known that these scams— including person-in-need scams, government agent impersonator scams, and lottery, sweepstakes, and prize scams, among others—often have involved telemarketing.  Despite its awareness of a substantial amount of fraud-induced money transfers involving Walmart, for many years, Walmart has failed to effectively detect and prevent consumer fraud involving money transfers at its locations.  This has been the case despite the fact that, as an agent of both MoneyGram and Western Union, Walmart's contracts with those providers and the stipulated court orders obtained by the FTC against MoneyGram and Western Union provided Walmart with notice about its obligations

to detect and prevent consumer fraud at its locations. *FTC v. MoneyGram International, Inc.*, No. 09-cv-6576 (N.D. Ill. Oct. 19, 2009); and *FTC v. The Western Union Company*, No. 17-cv-0110 (M.D. Pa. Jan. 19, 2017).

19.     One of the ways in which Walmart's anti-fraud practices have been deficient is in the training of its frontline employees, as well as its supervisors and managers, referred to internally as associates (collectively "employees" or "associates").  In many cases, Walmart has failed to properly train and oversee employees responsible for detecting and preventing consumer fraud involving money transfers at its locations.  These deficiencies have included Walmart's failure to provide employees with adequate initial and ongoing training on detecting and preventing consumer fraud, including training about questioning and warning consumers, and rejecting and stopping suspected fraud-induced money transfers.  Walmart also failed to ensure that its employees providing money transfer services are knowledgeable about the policies and procedures necessary for detecting and preventing consumer fraud and failed to follow the law in doing so.

20.     For example, on December 14, 2015, the FTC published a notice that it had adopted amendments to its Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), including a prohibition against using "cash-to-cash" money transfers for outbound and inbound telemarketing transactions.  80 Fed. Reg. 77520 (Dec. 14, 2015) (the "TSR Amendment").  This amendment became effective on June 13, 2016, and it prohibits the use of such money transfers for goods or services offered or sold through telemarketing or charitable contributions solicited or sought through telemarketing.  But until recently, Walmart failed to provide any instructions to its employees or warnings to consumers that specifically addressed the TSR Amendment.

21.     Walmart has also failed to adequately monitor money transfer activity and address suspicious money transfer activities at its locations, including by employees who have been complacent in detecting and preventing consumer frauds or, in some cases, were engaged in suspicious activities or even complicit in frauds.  In many cases, Walmart has facilitated scams by paying out fraud-induced money transfers in violation of its providers' anti-fraud or Anti-Money Laundering ("AML") policies and procedures, or by failing to implement and maintain its own anti-fraud program designed to detect and prevent consumer fraud at its locations.  For example, for many years, Walmart's decision not to train or instruct its employees to deny or reject payouts of money transfers that were suspicious and potentially due to fraud allowed fraudsters to more easily receive payouts of fraud-induced money transfers at Walmart locations.   In addition, Walmart has failed to properly train and ensure that its employees are knowledgeable about other basic and important procedures, such as verifying and accurately recording IDs and other customer information and addressing suspicious activity.  Walmart also has failed to ensure that its locations routinely provide required consumer fraud warnings.

22.     Over the years, compliance reviews and audits of Walmart stores by MoneyGram and Ria have documented some of the deficiencies in Walmart's anti-fraud program.  For example, MoneyGram's reviews in 2018 and 2019 found that hundreds of Walmart associates lacked knowledge about basic and important procedures, such as ID acceptance and requirements and how to address suspicious activity.  And between January and August 2019, Ria found that 39 percent of the Walmart stores it visited were missing fraud awareness materials and 24 percent of the stores were missing the send forms, which provide a consumer fraud warning on the front page.  Similar problems with untrained associates and fraud awareness materials have existed for years and have been reported to Walmart by MoneyGram and Ria.  As far back as 2014, for example, a

MoneyGram audit of 397 Walmart locations revealed that 39 percent of Walmart locations had untrained primary employees providing money transfer services at its Customer Services Desks and MoneyCenters and 60 percent of the locations had untrained secondary or backup employees.

**B. Walmart's Money Transfer Services**

23.     Consumers wishing to send or receive funds through a money transfer at a Walmart location can visit Walmart's Customer Service Desks and MoneyCenters.  Consumers can also initiate money transfers online at Walmart.com or through Walmart's Mobile Express Money Service App and finalize them at a Walmart location.  In or around mid-2017, Walmart began installing kiosks at some of its Customer Service Desks and MoneyCenters as an option for consumers to initiate their money transfers.  After using the kiosks to stage their money transfers, consumers are required to finalize the transactions at the counter with a Walmart associate.

24.     Money transfers sent or received by consumers through Walmart's providers are supposed to be for person-to-person use and not for businesses.  Walmart does not limit the maximum amount a consumer can send or receive through a Walmart money transfer.  Instead, it relies on its providers to impose the limits.  For years, the maximum amount of money that could be sent through MoneyGram at a Walmart location in the United States was $20,000 per day, but the limit for a single transaction was $10,000 until early 2018, when that amount was lowered to $8,000.   Originally,  the  maximum  amount  that  could  be  sent  through  a  domestic Walmart2Walmart money transfer through Ria was $900, but that was raised to $2,500 in October 2016.  Until sometime in 2018, generally, there were no set limits on the amount of money that a customer could receive through MoneyGram or Ria in one day.  In Canada, the maximum amount of a money transfer that can be sent from a Walmart location is $7,500 (CAD), while the maximum amount that can be received at a Walmart location in Canada is $5,000 (CAD).  Regardless of

location, consumers sending a money transfer from a Walmart store must pay with cash or a PIN-based debit card.

25.     For many years, when initiating a money transfer at a Walmart location, the sender typically was required to complete a "send form," which contained certain consumer fraud warnings.  The send form required the sender to provide his or her name, physical address, and telephone number, the name of the recipient, and the state/province and country to which the money transfer was being sent.  Repeat customers only had to provide their phone number (or rewards number) and were not required to complete the rest of the form.  In or around late 2019, Walmart stopped requiring senders to complete send forms, but before completing their transactions, Walmart began providing senders with a printout containing consumer fraud warnings in small print.

26.     For years, Walmart did not ask senders to present identification ("ID") unless their transfers exceeded a certain dollar threshold set by Walmart's providers.  For example, MoneyGram required its agents, including Walmart, to record the sender's ID information at $900 in the United States, while Western Union required its agents in Canada, including Walmart, to record the sender's ID information at $1,000 (CAD).  For money transfers of $3,000 or more, in accordance with the Bank Secrecy Act ("BSA"), senders in the United States have also been required to provide their Social Security Number or Tax Identification Number, or if not available, alien ID or passport information to be recorded.  Walmart did not begin requiring its associates to verify and record the sender's ID information for all transactions until relatively recently, and only did so because MoneyGram reduced its ID threshold to $1.

27.     To send a money transfer, consumers must pay a fee that varies depending on the platform (in person versus online), the destination, the amount, and the method of payment.

9

Walmart also offers flat-fee money transfer services for consumers through Walmart2Walmart and Walmart2World money transfers, which Walmart touts as a lower-cost alternative. Walmart has earned millions of dollars in these fees to date. Consumers are provided with a unique reference number by Walmart to track their transfers. Typically, the money is available for pickup within minutes after the money transfer has been sent.

28.     For many years, before paying out a money transfer, Walmart's providers required Walmart locations to have recipients (also referred to as receivers or beneficiaries) complete a "receive form" with the reference number, receive amount, recipient's name, physical address, and telephone number, sender's name, telephone number, and the city and state from which the transfer was sent. The recipient also was supposed to present his or her government- issued photo ID for verification in receiving the transfer, although the Walmart location was only required to record the recipient's ID at a certain dollar threshold. For example, for many years, Walmart was required to record the ID of a recipient who received a money transfer of $900 or more in the United States. In addition, when the recipient did not have an ID and the money transfer was less than a certain amount, such as $900, the sender sometimes had the option of using a preset answer to a test question. For money transfers of $3,000 or more, recipients in the United States also are required to provide their Social Security Number or Tax Identification Number, or if not available, alien ID or passport information to be recorded by the Walmart location. Beginning in or around May 2016, the ID threshold for recipients was lowered to $1, the test question was eliminated, and Walmart stopped using the receive forms.

29.     Once the cash funds have been paid out to the recipient, fraud victims usually have not been able to get their money back, either from Walmart or its providers. For example, for many years, senders typically could not get their money back unless they had asked for a refund

before the money transfer had been picked up. As a result of agreements that MoneyGram and Western Union reached with the FTC, as well as most of the states, between 2016 and 2018, those refund policies have been expanded to provide refunds if the providers or their agents have failed to follow certain anti-fraud policies and procedures, such as failing to provide the required consumer fraud warnings or to verify or accurately record IDs.

### C. Use of Walmart Money Transfers To Facilitate Fraud And Harm Consumers

30.     Walmart has provided an essential service to fraudulent telemarketers, sellers, and con artists by permitting them access to its providers' money transfer systems at its locations while failing to have its own comprehensive and effective anti-fraud program, and, in some cases, failing to comply even with its providers' anti-fraud policies and procedures. Exploiting this access to its full potential, perpetrators of mass marketing and imposter scams have received, and continue to receive, at Walmart locations, millions of dollars from victimized consumers, including many elderly consumers.

31.     Fraudulent telemarketers and con artists have preferred to use money transfers at Walmart stores to facilitate their scams because, among other reasons, there are many convenient locations from which victims can send the money. In addition, unlike many agents that use other forms of payments, such as money orders, for large payouts, Walmart pays recipients in cash, even for large-dollar transfers. Fraudsters also have been able to pick up money transfers within minutes and at multiple locations, and, oftentimes, the perpetrators have been afforded anonymity because either no IDs were required or fake IDs were used. For example, money transfers can be picked up at any location within a particular state or country; for many years, money transfers under $900 could be picked up without recipients having to present an ID; recipients have used fake names, addresses, and IDs; Walmart's employees in numerous instances have not been properly trained,

or have not been knowledgeable, regarding the policies or procedures that are required to detect and prevent fraud; some employees have failed to comply with the policies and procedures in paying out money transfers; and employees have sometimes been complicit in the frauds. In some cases, Walmart has violated its providers' policies and procedures, while in others, Walmart has failed to implement and maintain its own effective policies or procedures to detect and prevent fraud. Walmart's failures on this front often have made it easier for victims to unwittingly send money to fraudsters and for fraudsters to receive payments through money transfers at Walmart locations. At the same time, these failures have also made it more difficult for consumers and law enforcement to identify and locate the recipients of fraud-induced money transfers.

32.     For years, Walmart has been aware that criminal fraud rings, including those perpetrating telemarketing scams, have picked up fraud-induced money transfers at Walmart. For example, in May 2016, Walmart became aware that five individuals had been arrested in connection with an Internal Revenue Service ("IRS") impersonation scam conducted over the telephone that bilked thousands of U.S. consumers out of millions of dollars through fraud-induced money transfers picked up at Walmart locations. Ultimately, at least fifteen individuals were indicted in connection with that scheme, most of whom have since pleaded guilty. *See U.S. v. Caballero*, No. 16-cr-0124 (E.D. Ark.), *U.S. v. Caballero*, No. 16-cr-0201 (D. Minn.), and *U.S. v. Mirabal*, No. 16-cr-0269 (N.D. Tex.); *see also U.S. v. Pando*, No. 17-cr-0046 (N.D. Miss.), and *U.S. v. Labra*, No. 17-cr-0314 (D. Md.). In 2017, Walmart became aware of arrests in at least two other IRS impersonation scams that involved the extensive use of fake IDs at Walmart locations. In one of those scams, four individuals were charged in connection with a scheme that used fake IDs to pick up $666,537 in money transfers from 784 victims from January through August 2017, often at Walmart locations, with another 6,530 transactions totaling $2,836,745 linked to the fake

12

identities used by those "runners" (also known as "money mules"). *U.S. v. Gohil*, No. 17-cr-0212 (E.D. Wis.) (three of the defendants later pleaded guilty). In the other scam, two individuals pleaded guilty in connection with an India-based telemarketing scam, including one who later admitted to using 134 different fraudulent IDs to pick up over $1 million in fraud proceeds from September 2016 to May 2017, often at Walmart locations. *U.S. v. Patel*, No. 17-cr-0094 (E.D. Wis.).

33. Criminal authorities across the United States have charged other individuals in connection with mass marketing and telemarketing schemes that obtained millions of dollars in fraud-induced money transfers that were sent from or received at Walmart locations. *See, e.g.*, *U.S. v. Marcks*, No. 19-cr-0315 (D. Nev.) (five individuals charged in connection with India- based telemarketing and email marketing imposter scam targeting elderly consumers in the U.S. from June 2015 to April 2017 that falsely claimed consumers had outstanding taxes, open collection accounts, or other liabilities that required immediate payments to avoid adverse action; at least two defendants have pleaded guilty to conspiring with others in this scheme; internal documents show that Walmart later became aware that this scheme's runners picked up at least 874 fraud-induced transfers totaling over $545,000 at Walmart locations); *U.S. v. Parmar*, No. 19-cr-0160 (E.D. Va.) (six individuals charged in connection with international telemarketing scam involving government imposter and loan scams, including two individuals who pleaded guilty to working with others to pick up millions of dollars in fraud-induced money transfers from U.S. consumers, often at Walmart locations, from at least March 2017 until April 2019); and *U.S. v. Hines*, No. 17-cr-1038 (N.D. Iowa) (six individuals pleaded guilty to involvement in relative-in-need or "grandparent" telemarketing scam that used money transfers to bilk elderly consumers in the U.S. between December 2015 and September 2016; Walmart documents show the scheme used

Walmart locations to pick up fraud-induced transfers); *see also U.S. v. Smith*, No. 21-cr-0372 (M.D. Pa.) (two individuals charged in connection with an advance-fee sweepstakes scam conducted from October 2016 to June 2018 in which Jamaica-based fraudsters contacted victims by telephone or through the Internet; the defendants regularly received fraud-induced money transfers from multiple Walmart locations, including from multiple Walmart locations in the same day); and *U.S. v. Budhadev*, No. 20-cr-0252 (M.D. Pa.) (individual charged in connection with various India-based mass marketing schemes, including an advance-fee government grant scam, in which the fraudsters contacted victims by telephone or through the Internet; the defendant was charged with picking up over $500,000 in fraud-induced money transfers between October and December 2015, including over 300 money transfers totaling more than $407,000 from over 250 senders at seven Walmart locations). These schemes often involved suspicious money transfers for high-dollar amounts using fake IDs and/or money mules to pick up the proceeds of telemarketing and other frauds at Walmart locations.

34. Consumers who use Walmart's money transfer system are often not in a position to prevent fraud-induced transfers. By the time they come to Walmart to send money transfers, they already have been deceived by fraudulent schemes. Often, based on false promises or even fear of financial or legal consequences, they feel compelled to complete the transactions. Many consumers are not aware of the heightened risks associated with money transfers, such as a dramatically diminished possibility of fraud detection or transaction reversal as compared to other payment mechanisms, such as credit card transactions.

35. Walmart typically directs consumers to report fraud to its money transfer providers, which maintain databases of complaints and other reports they receive about fraud (hereinafter collectively "complaints"). For many years, those companies have shared complaints with

Walmart about money transfers sent and/or received at its stores. Based on information in MoneyGram's, Ria's, and Western Union's databases, between January 1, 2013 and December 31, 2018, those companies received at least 226,679 complaints about fraud-induced money transfers that were sent from or received at a Walmart location, totaling at least $197,316,611 (including fees). Of those complaints, MoneyGram received at least 176,672 complaints totaling at least $159,594,760, Ria received at least 43,603 complaints totaling approximately $32,741,213, and Western Union received at least 6,404 complaints totaling approximately $4,980,638. The average individual consumer fraud loss reflected by those complaints was approximately $870 from 2013 through 2018. These complaints represent only a small percentage of the actual fraud perpetrated through money transfers sent from or received at Walmart locations.

36. Walmart is responsible for a significant proportion of the complained-about fraud-induced money transfers flowing through its providers' money transfer systems. In fact, historically, Walmart has been responsible for more complaints about fraud-induced money transfers than any other agent worldwide. For example, for MoneyGram, between January 1, 2013 and December 31, 2018, Walmart was responsible for approximately 56 percent of all complaints about fraud-induced money transfers through MoneyGram worldwide. For Ria, from 2015 through 2018, Walmart was responsible for approximately 80 to 93 percent of all of the complaints about fraud-induced money transfers through Ria worldwide. For Western Union, between January 1, 2013 and December 31, 2018, Walmart was responsible for approximately 22 percent of all complaints about fraud-induced money transfers in Canada, where Walmart is one of its agents.

**D. Walmart's Role In Detecting And Preventing Fraud**

37.     As an agent dealing directly with consumers who send and receive money transfers through one or more providers, Walmart is well positioned to detect and prevent fraud-induced transfers.

38.     Walmart's role as a large agent offering multiple money transfer services makes it integral to that effort because Walmart controls whether to: implement and maintain policies and procedures concerning fraud-induced transfers, educate and train its employees on consumer fraud, supervise its employees to ensure that they are complying with anti-fraud policies and procedures, provide fraud warnings to consumers, monitor and investigate money transfer activity to identify unusual or suspicious activity, and take actions to prevent consumers from sending or receiving fraud-induced money transfers, including those related to telemarketing.  Indeed, Walmart is in fact obligated to do many of these things by contract or court order.

39.     Walmart has entered into written agreements with MoneyGram, Ria, and Western Union to provide money transfer services.  These agreements require Walmart to comply with its providers' policies and procedures, maintain records of money transfers it processes, and train its employees about compliance and the prevention of fraud and money laundering involving money transfer services at its locations.  These agreements also require Walmart to allow only authorized persons to access their systems and to prevent unauthorized use by providing access credentials, including passwords.  Walmart's agreement with MoneyGram, for example, requires it to maintain its own effective policies and procedures designed to detect and prevent consumer fraud, monitor all transactions conducted by Walmart, investigate activity consistent with money laundering and financial crimes, and take measures to prevent its services from being used to facilitate fraud and money laundering.  Walmart's agreement with Western Union requires it to monitor its personnel's performance of responsibilities under the contract and to notify Western Union and remedy any

deficiencies. Walmart's agreement with Ria provides that both parties are responsible for their own fraud prevention programs and Walmart also is responsible for training its employees and assumes full responsibility for supervising its employees' conduct. Under their agreements, Walmart's providers have the right to audit Walmart's records, compliance, and training of employees, but only with advance written notice. Walmart has commission, fee, and bonus arrangements with its providers that are based on the transactions it processes.

40.     Since in or around October 2009, MoneyGram and its agents, including Walmart, were subject to the Stipulated Order for Permanent Injunction and Final Judgment in *FTC v. MoneyGram*, No. 09-cv-6576 (N.D. Ill. Oct. 19, 2009) ("2009 Order"). Among other things, the 2009 Order enjoined violations of any provision of the TSR, as promulgated or later amended, by providing substantial assistance or support to any seller or telemarketer, and also enjoined MoneyGram and its agents from failing to establish, implement, and maintain a comprehensive anti-fraud program designed to protect U.S. and Canadian consumers from fraud-induced money transfers worldwide. The 2009 Order's requirements included, but were not limited to, providing warnings to consumers, providing appropriate and adequate ongoing education and training on consumer fraud at all locations, taking reasonable steps to monitor and investigate activity at locations to detect and prevent fraud, taking reasonable steps to identify locations that are involved or complicit in frauds, and routinely reviewing and analyzing data regarding money transfer activities that are unusual or suspicious. On February 1, 2010, Walmart acknowledged receipt of the 2009 Order. In several presentations made to FTC staff, beginning in or around April 2010, Walmart representatives committed to developing a plan to reduce fraud that would focus on associate training and consumer education. Walmart also represented that it had already implemented a comprehensive anti-fraud program.

41.     In or around January 2017, Western Union and its agents, including Walmart, became subject to the Stipulated Order for Permanent Injunction and Final Judgment in *FTC v. Western Union*, No. 17-cv-0110 (M.D. Pa. Jan. 19, 2017) ("2017 Western Union Order"). Under that order, Western Union and its agents must establish, implement, and maintain a comprehensive anti-fraud program designed to protect consumers worldwide by detecting and preventing fraud-induced money transfers. The order's requirements also include, but are not limited to, providing warnings to consumers, appropriate and adequate education and training to front line employees, monitoring of activity to prevent fraud-induced money transfers, investigation of and disciplinary action against agents, and adequate systematic controls to detect and prevent fraud-induced money transfers. The order also addresses compliance with the TSR Amendment's prohibition of cash-to-cash money transfers and requires Western Union and its agents to identify, prevent, and stop cash-to-cash money transfers initiated or received in the U.S. from being used as a form of payment in telemarketing transactions. These requirements include asking consumers before they transfer money whether their transfers are to pay for goods or services offered or sold through telemarketing and declining to process such money transfers.

42.     Finally, the order mandates that Western Union and its agents warn consumers that it is illegal for any seller or telemarketer to accept money transfers as payment for goods or services sold through telemarketing. On January 27, 2017, Western Union provided Walmart with a copy of the 2017 Western Union Order.

43.     In November 2018, a Stipulated Order for Compensatory Relief and Modified Order for Permanent Injunction ("Modified Order") was entered against MoneyGram. That Modified Order expanded the anti-fraud requirements of the 2009 Order to protect consumers worldwide and has similar requirements to the 2017 Western Union Order. It also required

MoneyGram to pay $125 million in compensatory relief. On December 5, 2018, Walmart acknowledged receipt of that order.

44. Walmart's agreements with its providers require it to comply with any orders, judgments, or decrees that apply to its providers, as well as any applicable laws. As an MSB, Walmart is required by the BSA to have an effective Anti-Money Laundering ("AML") program to guard against money laundering, including, but not limited to, guarding against the flow of illicit funds, such as funds derived from fraud.

45. Even in the face of these independent obligations to detect and prevent consumer fraud and money laundering, for many years, Walmart has failed to: (a) establish, implement, and maintain a comprehensive and effective anti-fraud program designed to detect and prevent consumer fraud; (b) properly train and ensure that its employees are knowledgeable about anti-fraud and AML policies and procedures designed to prevent consumer fraud; (c) adequately oversee and supervise employees responsible for providing money transfer services at its locations; (d) adequately monitor and investigate unusual or suspicious activity at its locations to prevent fraud-induced money transfers; (e) stop money transfers that Walmart or its employees should know or suspect are fraud-induced; (f) adequately collect, record, and report consumer fraud involving money transfers at its locations; and (g) take other reasonable steps to prevent fraudulent telemarketers, sellers, and con artists from using money transfer services offered by Walmart to perpetrate their frauds. In some cases, Walmart has failed to adopt effective policies concerning these practices, while in others, Walmart has failed to adhere to, or has violated, its providers' policies and procedures or its own anti-fraud and AML programs, policies, and procedures.

**E. Walmart Has Regularly Processed Fraudulent Money Transfers**

19

46.     Perpetrators of many different types of mass marketing and imposter scams have relied on money transfer systems, including MoneyGram's, Ria's, and Western Union's systems, as a means of fraudulently obtaining money from consumers around the world—especially U.S. consumers.  The types of scams include, but are not limited to, online or Internet purchase scams, person-in-need (including grandparent) scams, Good Samaritan or charity scams, investment scams, employment scams, rent scams, romance scams, advance fee loan scams, debt relief scams, lottery or prize scams, imposter scams, and cyber or malware scams.  All of these scams operate deceptively in violation of Section 5 of the FTC Act, and many of the scams also involve fraudulent telemarketing in violation of the TSR.  In these scams, consumers often are instructed over the telephone, through text message, by email, or over the Internet to send money transfers.  The telemarketers and con artists use false or misleading statements to induce consumers either to pay for purported goods or services, such as loans or large cash awards, or to make payments as a result of purported circumstances, such as emergencies, that do not exist.

47.     Victims of fraud-induced money transfers often send their money transfers from Walmart locations.  In some cases, fraudsters even direct consumers to send their money transfers from a Walmart location.  In many cases, older consumers (ages 65 and older) have been financially exploited by sending money transfers in connection with common telemarketing scams, such as grandparent scams, Good Samaritan scams, lottery or prize scams, and romance scams, from Walmart locations.  The average loss suffered by older consumers is usually greater than for younger consumers.  In addition, perpetrators of the scams, or those acting on their behalf, including fraud rings and money mules, frequently collect the proceeds of the frauds from Walmart locations, and in some instances, those individuals have even been employees of Walmart.

48.     MoneyGram's, Ria's, and Western Union's records show that Walmart has been responsible for a substantial amount of fraud-induced money transfers through their money transfer systems.  As Walmart is aware, many fraud-induced money transfers described in those records involve telemarketing scams.  Between January 1, 2013 and December 31, 2018, Walmart locations were responsible for processing at least $197,316,611 in money transfers that were the subject of complaints and over $1.3 billion money transfers that were related to those complaints and therefore could have been fraud-induced.

**49.     Information from MoneyGram indicates that between January 1, 2013 and December 31, 2018:**

a.  MoneyGram received a total of at least 176,672 complaints reporting losses of $159,594,760 (including fees) involving Walmart, including complaints about the following scams, which typically involve telemarketing:

   i.   at least 19,035 complaints with losses of $19,386,770 about person-in-need or grandparent scams;

   ii.  at least 15,401 complaints with losses of $7,749,949 about advance fee, loan-grant, or other loan scams;

   iii. at least 10,192 complaints with losses of $7,844,700 about romance scams;

   iv.  at least 8,375 complaints with losses of $5,879,474 about lottery scams;

   v.   at least 1,590 complaints with losses of $1,971,761 about IRS and utility scams, including investment scams involving IRS imposters; and

   vi.  at least 355 complaints with losses of $351,857 about cyber, malware, or other tech support scams.

b.  An additional 695,404 money transfers with total losses of $376,322,686 (including fees) were linked to complaints received by MoneyGram about fraud-induced money transfers involving Walmart.

c.  Although Walmart has accounted for approximately 26 percent of MoneyGram's money transfers based on volume and approximately 24 percent based on dollar amount, Walmart was responsible for sending or paying out approximately 56 percent of all complained-about fraud-induced money transfers worldwide through MoneyGram.

50.  **Information from Ria indicates that between April 24, 2014 and December 31, 2018:**

a.  Ria received a total of at least 43,603 complaints reporting losses of $32,741,212.93 (including fees) that were sent from or received at a Walmart location, including complaints about the following scams, which typically involve telemarketing:

    i.  at least 4,815 complaints with losses of $2,525,065 about prize and lottery scams;

    ii.  at least 3,092 complaints with losses of $1,809,725 about Good Samaritan scams;

    iii.  at least 1,641 complaints with losses of $884,413 about romance and online dating scams;

    iv.  at least 1,514 complaints with losses of $2,035,382 about emergency or grandparent scams;

    v.  at least 924 complaints with losses of $623,907 about advance-fee loan scams;

vi.  at least 855 complaints with losses of $565,062 about elder abuse scams;

vii.  at least 385 complaints with losses of $256,270 about debt relief scams; and

viii.  at least 54 complaints with losses of $62,532 about IRS imposter scams.

b. An additional 2,056,697 money transfers totaling $878,383,329.49 (without fees) were transactions conducted by senders or recipients of fraud-induced money transfers, and therefore, were potentially related to fraud.

c. Walmart has accounted for approximately 36 percent of Ria's money transfers based on volume and approximately 27 percent of Ria's money transfers based on dollar amount, but in 2017 alone, Walmart accounted for approximately 93 percent of Ria's fraud cases based on volume and approximately 89 percent of Ria fraud cases based on dollars. In 2018, Walmart accounted for approximately 87 percent of Ria's fraud cases based on volume and approximately 90 percent of Ria fraud cases based on dollars.

51. **Information from Western Union indicates that between January 1, 2013 and December 31, 2018:**

a. Western Union received a total of at least 6,404 complaints reporting losses of $4,980,638.36 (including fees) involving Walmart in Canada, including 1,889 complaints totaling $1,228,446 about transfers that originated from or were paid out in the United States.

b. An additional 146,213 money transfers totaling approximately $93,270,569.72 (including fees) were identified by Western Union as being related to senders or receivers of confirmed fraud transactions, transactions considered to be potential

fraud after an investigation of a Walmart location, or transactions associated with risky typologies associated with consumer fraud scams.

c.  Altogether, Walmart was responsible for sending or paying out approximately 22.1 percent of all complained-about fraud-induced money transfers in Canada through Western Union.

52.     After the maximum dollar amount for Walmart2Walmart money transfers increased from $900 to $2,500 in October 2016, there was a significant increase in fraud transactions involving Ria.  In fact, between August 2016 and August 2017, the volume of fraud involving Walmart2Walmart money transfers increased by 374 percent, even though the transaction volume of such transfers had only increased by 54 percent.  In September 2016, a month before Ria increased the limit of a Walmart2Walmart transaction, Ria received 574 fraud reports totaling $293,249.87 for that month.  Six months later, in March 2017, Ria received 1,336 fraud reports totaling $1,318,138.19—more than four times the reported fraud amount from September 2016.  Moreover, after increasing the maximum dollar amount of a Walmart2Walmart transfer, the number of annual fraud reports to Ria more than doubled between 2016 and 2017 from 8,112 to 16,922 fraud cases, and the amount of reported fraud loss more than tripled from $4,659,930.43 to $14,371,085.60.  Those fraud report numbers remained high throughout 2017, with the average monthly fraud volume at 1,410 complaints totaling $1,197,590.47 in losses.  By March 2018, the monthly reported fraud volume involving Walmart2Walmart transfers reached a peak of 1,751 complaints totaling $1,578,412.95.

53.     In March 2017, at least 4,974 fraud-induced money transfers totaling $5,081,268.62 were reported to MoneyGram and Ria concerning transactions that were either sent from or paid out at a Walmart location, or both.  These were the largest monthly totals of reported

fraud-induced transfers since February and March 2016, when MoneyGram experienced technical problems with its interdiction system as described below.

54. For many years, Walmart also has been aware of consumer fraud involving its stores, including particular locations that had very high levels of consumer fraud and suspicious activities. In fact, MoneyGram and Western Union have provided information to Walmart about certain locations in the United States and Canada that had fraud rates of more than 25 percent, 50 percent, or even 75 percent of their money transfer activity (based on the number or dollar amount of transactions) when taking into account confirmed fraud and linked or potential fraud. Although Ria did not provide Walmart with similar information about fraud rates at its locations based on confirmed and linked or potential fraud, it did provide Walmart with information about confirmed fraud at locations, as well as unusual or suspicious activity, such as transactions that had bad addresses, including addresses that were P.O. boxes, incomplete, or listed as "anywhere," "unknown," or "not given."

55. In May 2018, Walmart conducted an analysis of Walmart locations in the United States that would be classified as an Elevated Fraud Risk Agent Location ("EFRAL") under the 2017 Western Union Order, and determined that, from January 2017 through January 2018, there were 317 instances in which Walmart stores met the EFRAL criteria, including 12 stores that had 15 or more complaints in a two-month period. The remaining 305 stores had five or more complaints that amounted to five percent or more of money transfers received at those locations. Those 317 separate instances involved 190 unique Walmart store locations because some of the stores had met the criteria more than once.

**F. Walmart Has Failed To Effectively Detect And Prevent Fraud-Induced Money Transfers**

56.     For many years, perpetrators of frauds, including fraudulent telemarketers, sellers, and con artists, have accessed and exploited Walmart's money transfer services, and Walmart's locations have played an integral role in the scams.  Walmart's locations have been more susceptible to fraud-induced money transfers in part due to the thousands of associates authorized to provide money transfer services at its locations, the high turnover rate of associates, heavy customer traffic, and/or various shifts of associates working at a single location.  In addition, as a dual agent for MoneyGram and Ria in the United States, there is a heightened risk of consumer fraud at its locations because consumers can send and receive money transfers through two different money transfer companies without being detected by those companies. Walmart has been, or should have been, well aware of these facts.

57.     Walmart nonetheless has failed to take basic and important steps to address consumer fraud, including by failing to implement and maintain effective policies and procedures to detect and prevent fraud, provide education and training that included clear directions to its employees about detecting and preventing consumer fraud, supervise and oversee its employees to ensure that they are complying with anti-fraud and AML policies and procedures, routinely provide fraud warnings to consumers, adequately monitor and investigate money transfer activity to determine if there is any unusual or suspicious activity, and take effective actions to prevent consumers from sending or receiving fraud-induced money transfers, including those related to telemarketing.

58.     In many instances, Walmart's locations have not complied with Walmart's providers' anti-fraud or AML policies and procedures.  Walmart also has not taken adequate and timely steps to address the deficiencies and inconsistencies in its own anti-fraud program, policies,

and procedures and to address consumer fraud at its locations. In addition, in some cases, Walmart has had corrupt or complicit employees at its locations that have facilitated the payments of fraud-induced money transfers. As a result of Walmart's failure to implement and maintain a comprehensive anti-fraud program to detect and prevent consumer fraud, it has played a significant role in sending and receiving fraud-induced money transfers through its providers' money transfer systems. These failures have caused many millions of dollars in consumer losses, without providing benefits to consumers or competition that has outweighed the harm suffered by defrauded consumers.

### G. Walmart Has Failed To Establish, Implement, And Maintain A Comprehensive Anti-Fraud Program

59.     For many years, Walmart has failed to establish, implement, and maintain its own comprehensive anti-fraud program, policies, procedures, and controls designed to detect and prevent consumer fraud even though Walmart has been aware that there was a substantial amount of fraud-induced money transfers moving through the money transfer systems at Walmart's locations. Until in or around November 2014, Walmart did not even have a written anti-fraud and consumer protection program documenting its policies and procedures for detecting and preventing consumer fraud at its locations.

60.     Even after establishing a written anti-fraud program, in some cases, Walmart violated its own program requirements. For example, although Walmart's anti-fraud program required stores that had been identified by its providers as having higher incidents of fraud received at their locations to complete "Receive Fraud Training" within seven days of when the training was assigned, in many cases, those locations did not comply with that requirement. In some cases, the training required by MoneyGram at particular locations was not completed for months after Walmart's policies required it. In addition, even though Walmart's anti-fraud program required

Walmart stores to have certain consumer education and awareness materials, including consumer fraud warnings and pamphlets, in many cases, Walmart locations have not complied with those requirements.

61.     For many years, Walmart's anti-fraud program also had no written procedures for its associates to prevent suspected or known fraud-induced money transfers from being paid out at its locations.  For example, in Walmart's July 2014 and November 2017 programs, although there were written procedures on how Walmart associates should respond when they suspected that senders of money transfers may be victims of fraud, there were no written procedures for how Walmart associates should respond when they suspected that receivers of money transfers may be potential fraudsters.

62.     On April 19, 2017, MoneyGram conducted a Home Office Review of Walmart's anti-fraud program and found that: (1) Walmart had not effectively prevented fraud transactions; (2) Walmart had not properly completed required information on transaction records; and (3) Walmart had not reported, filed, or referred all Suspicious Activity Reports ("SARs") as required. In an August 10, 2017 letter to Walmart, MoneyGram explained that the main concern for the finding that Walmart had not effectively prevented fraud transactions was because, "at the policy level," Walmart was "not reject[ing] potential consumer fraud related transactions on the receiv[ing] end."

**H.  Plaintiff's Experience**

63.     In October 2021, Plaintiff received a letter by mail, and which was followed up by a text message to her phone, offering her employment.  Specifically, Plaintiff was told that she would be paid $700 to put an advertisement on her car for a month.  Plaintiff responded to the text message stating that she was interested.

28

64.     Plaintiff was then sent a check for approximately $5,200, approximately $4,500 more than the amount agreed upon. Plaintiff was then contacted by the same phone number asking her to confirm that she received the check. Plaintiff replied that she received the check but reported that she seemed to have accidentally been overpaid. Plaintiff was then told to deposit the check but to send a money order via Walmart for the $4,500 overpayment.

65.     Plaintiff dutifully followed these directions, depositing the check in her bank account and then on the same day Plaintiff visited the Walmart on 3626 Touhy Ave, Skokie, IL 60076 to transfer the $4,500 overpayment.

66.     A few days later, Plaintiff was informed by her bank that the check for approximately $5,200 that she had deposited had bounced, meaning that she had lost the entire $4,500 that she had sent via the Walmart money transfer service.

67.     It was at this point, that Plaintiff realized she was the victim of fraud.

68.     Plaintiff immediately went to her local police station to file a police report.

69.     Plaintiff attempted to call the wire transfer service to stop the payment but was told she had to wait a week.

70.     After a week however, Plaintiff was told that the wire transfer had already been cashed and there was nothing that she could do.

71.     To date, Plaintiff has not been compensated for her $4,500 loss.

## CLASS ALLEGATIONS

72.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

73.      The proposed classes are defined as:

**The Nationwide Class**

All persons who incurred unreimbursed losses due to fraud through money transfers initiated at a Walmart location.

**The Illinois Subclass**

All persons who incurred unreimbursed losses due to fraud through money transfers initiated at a Walmart location in the state of Illinois.

The Nationwide Class and Illinois Subclass are hereinafter collectively referred to as the "Classes."

74.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

75.     Specifically excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

76.     The members of the Classes are so numerous that joinder is impractical.  The Classes consist of tens of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Defendant's records.

77.     The claims of the representative plaintiff are typical of the claims of the Classes in that the representative plaintiff, like all members of the Classes, was similarly injured through Defendant's uniform misconduct as alleged above.  As alleged herein, Plaintiff, like the members of the Classes, was deprived of monies that rightfully belonged to her.  Further, there are no defenses available to Defendant that are unique to Plaintiff.  Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes, and represents a common thread

of unfair and unconscionable conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

78. There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

79. The questions of law and fact common to the Classes include:

a. Whether Defendant's representations and omissions about Walmart's money transfer services are false, misleading, deceptive, or likely to deceive;

b. Whether Defendant failed to disclose the risks of using the Services;

c. Whether Plaintiff and the Class members were damaged by Defendant's conduct;

d. Whether Defendant's actions or inactions violated the consumer protection statutes invoked herein;

e. Whether these practices violated Illinois and federal law;

f. The proper method or methods by which to measure damages;

g. Whether Defendant is legally required to cover transactions that Plaintiff and Class members were fraudulently induced to enter into; and

h. The declaratory, injunctive, and other equitable relief to which the Classes are entitled.

80. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions and large corporations. Accordingly,

Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

81.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Walmart, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

82.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

83.     Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Classes, is at risk of being victimized by future fraudulent transactions that Defendant will refuse to cover. Plaintiff and the members of the Classes are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

84.     Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
### Breach of The Covenant Of Good Faith And Fair Dealing
### (On Behalf of The Classes)

85.     Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

86.     Plaintiff brings this claim on behalf of herself and members of the Classes.

87.     Plaintiff and members of the Classes contracted with Defendant for the provision of money transfer services.

88.     Under the law of each of the states where Defendant does business, an implied covenant of good faith and fair dealing governs every contract. The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

89.     This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

90.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

91.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

92.     Defendant breached the covenant of good faith and fair dealing when, as described herein, it failed to fairly investigate reported fraudulent transactions at Walmart and failed to reimburse customers for fraud-induced losses incurred using Walmart's money transfer services.

93.     Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

94.     Plaintiff and members of the Classes have performed all of the obligations imposed on them under the contract.

95.     Plaintiff and members of the Classes have sustained monetary damages as a result of Defendant's breaches of the contract and the covenant of good faith and fair dealing.

## COUNT II
**Violations of The Illinois Consumer Fraud And Deceptive Business Practices Act**
**815 Ill. Comp. Stat. 505/1, *et seq*.**
**(On Behalf of The Illinois Subclass)**

96.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

97.     Plaintiff brings this claim individually and on behalf of the members of the Illinois Subclass against Defendant.

98.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices . . . are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

99. By the conduct described in detail above and incorporated herein, Defendant engaged in unfair or deceptive practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

100. Defendant's practices regarding the operation of its money transfer services, including its inadequate fraud prevention practices, are material facts that a reasonable person would have considered in deciding whether or not to use the Services.

101. Plaintiff and the Class members justifiably acted or relied to their detriment upon Defendant's omissions of material fact concerning the above-described practices.

102. Had Defendant disclosed all material information regarding the inadequate nature of Defendant's anti-fraud practices to Plaintiff and the other Illinois Subclass members, Plaintiff and the Illinois Subclass members would not have used the Services.

103. Defendant's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Illinois Subclass.

104. The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent that using the Services is safe. Such representations misled the Plaintiff and are likely to mislead the public. Additionally, Defendant willfully and intentionally concealed and omitted the security risks of using the Services, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by Defendant. As a matter of secret policy, this is a practice that is likely to deceive a consumer acting reasonably under the circumstances, to the consumer's detriment.

105.    Defendant's conduct is also misleading in a material way because, as discussed above, it fails to comport with Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), which prohibits unfair or deceptive actors or practices, as recognized by the Federal Trade Commission.

106.    As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff and the other Illinois Subclass members have suffered ascertainable loss and actual damages.  Plaintiff and the other Illinois Subclass members who used the Services would not have used the Services had the truth about Defendant's insufficient fraud prevention practices been known.  Plaintiff and the other Illinois Subclass members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill Comp. Stat. 505/1, *et seq.*

**COUNT III**
**Violation of The Electronic Fund Transfers Act, 15 U.S.C. § 1693 *et seq.***
**(On Behalf of the Classes)**

107.    Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

108.    Plaintiff brings this claim on behalf of herself and members of the Classes.

109.    The fraudulent transfers described above are electronic funds transferred as defined under the EFTA.

110.    Per the EFTA and Regulation E, Defendant bears the financial responsibility for these unauthorized transfers.

111.    The EFTA caps consumer liability for unauthorized electronic fund transfers at $50 and the transactions at issue exceed that amount. 15 U.S.C. § 1693g(a).

112.    Defendant has violated the EFTA by refusing to cover the aforementioned unauthorized transfers, in violation of the EFTA's sharp limitation on consumer liability.

113.    Defendant failed to conduct a reasonable investigation.

114.    For example, a reasonable investigation of Plaintiff's situation would have included review of one or more of the following items, which would have led Defendant to conclude that fraud had occurred:

1) Historical information on the customer's pattern of use (*e.g.*, time, frequency, location, and types and amounts of transactions);

2) Complaints to the FTC and CFPB; and

3) Plaintiff's Police report.

115.    Furthermore, a reasonable investigation would have revealed, *inter alia*, the following:

1) Plaintiff did not authorize the disputed transaction;

2) Plaintiff filed a police report concerning the fraudulent transaction;

3) Plaintiff has no criminal history; and

4) Plaintiff has no history of fraud with Defendant or any other financial institution.

116.    Moreover, the EFTA places the burden of proof on the financial institution to demonstrate that challenged transfers were authorized or, if they were unauthorized, that the consumer can be held liable for them. 15 U.S.C. § 1693g(b).

117.    This burden of proof cannot be and was not plausibly met with regard to the contested transactions and Defendant could not have plausibly concluded that the transfers were authorized.

118.    In short, any reasonable investigation of these transactions would have resulted in Defendant cancelling transfers and crediting Plaintiff's account for the stolen funds.

119.    Defendant's acts and omissions set forth above constitute violations of the EFTA.

120.    As a direct and proximate result of Defendant's violations of the EFTA, Plaintiff

and Class members are entitled to an award of statutory and actual damages as well as attorney's fees and costs.

121.     Defendant did not conduct a good faith investigation regarding the stolen funds.

122.     Defendant did not have a reasonable basis for believing the accounts were not in error.

123.     Defendant willfully concluded that Plaintiff and Class member's accounts were not in error when such a conclusion could not reasonably have been drawn from the evidence available to Defendant at the time of the investigation.

124.     In light of the foregoing – in addition to all other relief sought herein – Plaintiff is also entitled to recover treble damages under Section 1693f(e).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying this action as a class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

(b)     For compensatory, statutory, and punitive damages on all applicable claims and in an amount to be proven at trial;

(c)     For restitution on all applicable claims and in an amount to be proven at trial;

(d)     For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

(e)     For an order enjoining the wrongful conduct alleged herein;

(f)     For other appropriate injunctive and other equitable relief;

(g)     For costs;

(h)    For pre-judgment and post-judgment interest as provided by law;

(i)    For attorneys' fees under the account contracts, the common fund doctrine, and all other applicable rules and law; and

(j)    For such other relief as the court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  June 9, 2023                    Respectfully submitted,

By: */s/ Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Facsimile: (212) 686-0114
E-mail: malmstrom@whafh.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*pro hac vice* forthcoming)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Julian C. Diamond (*pro hac vice* forthcoming)
Matthew A. Girardi (*pro hac vice* forthcoming)
1330 Avenue of the America
32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jdiamond@bursor.com

*Attorneys for Plaintiff*